UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FUTURE MOTION, INC., <br>     Plaintiff, <br> v. <br> JW BATTERIES LLC, <br>     Defendant. | Case No. 21-cv-06771-EMC <br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** <br><br> Docket No. 16 |

Plaintiff Future Motion, Inc. is a company that markets and sells "the ONEWHEEL® line of self-balancing electronically motorized skateboards, along with related accessories, replacement parts, and merchandise." Compl. ¶ 9. The skateboards have processors and software incorporated into them that control various functions and safety features – *e.g.*, "monitoring the status of the skateboard and causing it to slow down or stop if it approaches an unsafe operating condition." Compl. ¶ 11. Future Motion has filed suit against Defendant JW Batteries LLC ("JW") because the latter sells a computer processor chip that is allegedly intended to circumvent the safety and technological measures implemented by Future Motion for its skateboards. Also, JW sells a sticker that Future Motion claims incorporates a Future Motion trademark. Currently pending before the Court is JW's motion to dismiss for lack of personal jurisdiction and/or improper venue.[1]

Having considered the parties' briefs and accompanying submissions (including the supplemental briefing provided after Future Motion had an opportunity to take jurisdictional

---
[1] The Court previously gave Future Motion leave to take jurisdictional discovery. *See* Docket No. 30 (order).

1  discovery), the Court hereby **GRANTS** the motion to dismiss.

**I.     FACTUAL & PROCEDURAL BACKGROUND**

A.   Complaint

In the complaint, Future Motion alleges as follows.

Future Motion is a company that markets and sells the ONEWHEEL® line of self-balancing motorized skateboards.  *See* Compl. ¶ 9.  Below is an example of a user riding one of the skateboards.



Compl. ¶ 9.

Future Motion uses processors and software in the skateboards to control various functions and safety features.  *See* Compl. ¶ 11.  Some of the important safety features involve "communications between the battery management system processor ('BMS'), which monitors the status of the skateboard battery, and the main controller of the skateboard."  Compl. ¶ 12.  "[T]he controller is programmed not to allow the skateboard motor to operate unless [it] receives information from the BMS indicating that the battery is in a safe riding condition."  Compl. ¶ 16.  Also, the controller is programmed to take action to avoid potential rider injury – *e.g.*, "a battery approaching an extremely high power draw or an extremely low state of charge will cause pushback to avoid rider injury."  Compl. ¶¶ 12, 17.

JW is a company that advertises and sells a computer processor chip "intended to circumvent the Future Motion safety and technological measures [such as] those descried above."  Compl. ¶ 20.  The chip is known as the JWFFM Chip, with "FFM" meaning "'F*ck Future

Motion.'"  Compl. ¶ 20. JW sells the chip through its e-commerce website. *See* Compl. ¶ 21. The JWFFM Chip intercepts communications between the BMS and controller in the Future Motion skateboard and further alters and deletes information from the BMS that could indicate an unsafe riding condition. *See* Compl. ¶ 22. "In this manner, the JWFFM Chip allows unauthorized, aftermarket batteries to access the . . . controller and to control the skateboard, regardless of whether the battery meets Future Motion's safety requirements." Compl. ¶ 22. JW has a video on its YouTube channel that shows customers how to install the chip. JW also offers to install the chips for customers itself. *See* Compl. ¶¶ 24-25.

In addition to the above, JW offers "JWXR" stickers through its website "which incorporate Future Motion's distinctive, stylized XR trademark, as shown below."


Defendant's Use of JWXR


Future Motion's XR Mark

Comp. ¶ 28. JW's sticker "creates the false impression that [JW] is affiliated with Future Motion, or that Future Motion sponsors or approved [JW] or its products." Compl. ¶ 29.

Based on, *inter alia*, the above allegations, Future Motion asserts the following causes of action.

    (1) Circumvention of a technological measure in violation of the Copyright Act. *See* 17 U.S.C. § 1201.[2]

---

[2] Section 1201(a)(1)(A) provides in relevant part: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

Section 1201(a)(2) provides in relevant part:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that –

(2) Violation of the Computer Fraud & Abuse Act. *See* 18 U.S.C. § 1030.[3]

(3) False designation of origin in violation of the Lanham Act. *See* 15 U.S.C. § 1125(a).

B. <u>Jurisdictional Evidence</u>

Both parties have provided evidence related to whether JW has a presence in California for purposes of personal jurisdiction. That evidence indicates as follows.[4]

- **JW's location.** JW is a Texas corporation. Its only physical location is in Texas. *See* Martin Decl. ¶ 2. It does not operate any location in California. *See* Martin Decl. ¶ 5.

- **JW's products.** JW's products include the chip at issue, *i.e.*, the JWFFM Chip, as well as batteries. *See* Martin Decl. ¶ 8 (testifying that JW "offers a number of products for sale through its website *including* the JWFFM Chip") (emphasis added). According to Future Motion, the chip and the batteries work hand in hand. Specifically, the batteries will not work unless the JWFFM Chip is installed, and the chip does not function as planned without the battery. At the hearing on the motion to dismiss, JW did not dispute Future Motion's assertion about the relatedness of the chips and batteries.

- **JWFFM Chip.** To develop the JWFFM Chip, JW borrowed a Future Motion Onewheel from a resident of Texas; it did not purchase the product from Future

---

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; [or]

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title . . . .

*Id.* § 1201(a)(2).

[3] Section 1030(a)(5)(C) prohibits one from "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss." 18 U.S.C. § 1030(a)(5)(C).

[4] The evidence described below includes evidence obtained by Future Motion from jurisdictional discovery.

4

Motion or anyone else.  *See* Martin Reply Decl. ¶ 9.

- **JW's means of selling its products.**  JW sells all of its products, including the JWFFM Chip, through a website, https://jwbatteries.com/.  *See* Martin Decl. ¶ 7.  JW does not have a contractual relationship with anyone in California for sales or distribution of its products.  *See* Martin Decl. ¶ 5.

- **JW's advertising.**  JW maintains that it does not "run any advertisements for its products in California or otherwise."  Martin Decl. ¶ 10.  Future Motion suggests that JW still advertises through its website as well as through its Instagram and Facebook accounts.  *See* Kolitch Decl. ¶¶ 5-6.  However, Future Motion has not pointed to anything specifically about JW's website or its social media accounts that indicates a targeting of California customers.

- **JW's sales.**  JW has shipped its products to customers in 45 states, plus D.C.  *See* Martin Decl. ¶ 12(a) (adding that JW has shipped products to 10 jurisdictions outside of the United States).

    o  Since JW started tracking distribution of the stickers, it has sold 79 stickers nationwide, with 15 out of the 79 being sold to people in California (about 19%).  *See* Pl.'s Supp. Br., Ex. B.

    o  For a 16-month period (September 2020-January 2022), JW had 583 sales with California customers (including about 60 returns).  The bulk of these sales – 570 – involved "relevant" products (*i.e.*, not just chips but also batteries).  *See* Pl.'s Supp. Br., Ex. C.  Therefore, on average, there were about 36 sales of "relevant" products per month to Californians (570/16 = 35.6).

    o  For a 17-month period (August 2020-January 2022), JW had 3,415 sales total (most in the United States).  The bulk of these sales – 3,350 – involved "relevant" products.  *See* Pl.'s Supp. Br., Ex. D.  Accordingly, if there were 570 out of 3,350 sales of "relevant" products to California, sales to

California represented about 17% of the total.[5]

- o JW's sales to California also account for less than 19% of total sales in terms of revenue (not just units).[6] *See* Martin Decl. ¶ 12(b).

- **Installation of the JWFFM Chip.** JW can install the chip for its customers if requested. JW found two instances in which a customer sent it a product from California so that JW could install a JWFFM Chip. *See* Martin Reply Decl. ¶ 7. JW also suggests how a customer can get a JWFFM chip installed by someone else. For example, on its webpage for the JWFFM chip, JW has a "FAQ" section where it states that "we highly encourage individuals to have the chip professionally installed"; that "Stoke Life Services can handle the installation"; and that jon@stokelife.guru can be contacted "for more information and the SLS shop in your area." Kolitch Decl. ¶ 2 & Ex. A (JWFFM Chip webpage). "SLS is a global Personal Electric Vehicle (PEV) repair shop network – something like an Angie's List for PEV repair shops." Martin Reply Decl. ¶ 2. Although JW makes referrals to SLS, there is no indication that JW has a contractual relationship with SLS. Counsel for JW confirmed this at the hearing.

- **Communications between JW and California customers.** Future Motion has provided evidence demonstrating that JW has communicated with prospective customers located in California, as well as existing customers located in California (*e.g.*, to provide technical support). These communications, however, do not indicate that JW is reaching out to prospective or existing customers in California; rather, the communications indicate that those customers are reaching out to JW. Nor is there any indication that communications with customers generally were targeted at California.

---

[5] If the Court were to look at only chips, it appears that there were about 125 sales of chips to Californians and that there were about a total of 640 sales of chips. 125/640 is about 19.5%.
[6] With respect to the JWFFM Chip specifically, sales to California "account for a little more than 3% of [JW's] revenue." Martin Decl. ¶ 12(c).

6

## II. DISCUSSION

### A. Legal Standard

A motion to dismiss for lack of personal jurisdiction is brought pursuant to Federal Rule of Civil Procedure 12(b)(2).

> When a defendant moves to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." [If] no evidentiary hearing occur[s] . . . , "the plaintiff need only make a prima facie showing of jurisdictional facts." All uncontroverted allegations in the complaint are deemed true, and factual disputes are to be resolved in favor of the non-moving party.

*Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017).

A motion to dismiss for improper venue is brought pursuant to Rule 12(b)(3). In the instant case, JW's venue argument applies to the Copyright Act claim only. Title 28 U.S.C. § 1400(a) provides that "[c]ivil actions . . . arising under any Act of Congress relating to copyrights . . . may be instituted in the district in which the defendant or his agent resides or may be found." 28 U.S.C. § 1400(a). The Ninth Circuit "interprets this provision to allow venue in any judicial district where, if treated as a separate state, the defendant would be subject to personal jurisdiction." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1126 (9th Cir. 2010).

### B. Personal Jurisdiction

"Where . . . no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits. California's long-arm statute 'is coextensive with federal due process requirements, [so] the jurisdictional analyses under state law and federal due process are the same.'" *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).

There is no dispute here that JW is not a resident of California. "A district court's exercise of jurisdiction over a nonresident defendant comports with due process when the defendant has at least 'minimum contacts' with the forum and subjecting the defendant to an action in that forum would 'not offend traditional notions of fair play and substantial justice.'" *Ayla, Ltd. Liab. Co. v. Alya Skin Pty. Ltd.*, No. 20-16214, 2021 U.S. App. LEXIS 25921, at *8-9 (9th Cir. Aug. 27, 2021). There can be either general jurisdiction or specific jurisdiction over a nonresident

7

defendant.

In the instant case, Future Motion does not contend that there is general jurisdiction over JW. Instead, it asserts only specific jurisdiction. For specific jurisdiction, the Ninth Circuit applies a three-prong test.

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*CollegeSource*, 653 F.3d at 1076. The plaintiff bears the burden of meeting the first two prongs above; if it does so, then the burden shifts to the defendant "to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

With respect to the first prong, the Ninth Circuit usually uses a purposeful direction analysis in tort cases,

> "applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." The "effects" test, which is based on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011).

In the case at bar, JW focuses on the express aiming prong of the effects test. It argues that all it has done is sell products on the Internet on a national scale, which is not enough to show express aiming at California – even taking into account the sales it has made to California. Future Motion disagrees. For the reasons discussed below, the Court finds JW's argument persuasive. Although at this juncture, Future Motion need only establish a prima facie case of jurisdiction, it has not met even that relatively lenient standard.

C. <u>Specific Jurisdiction: Express Aiming</u>

As an initial matter, Court notes that Future Motion's analysis has fundamental flaw –

8

1  which JW points out. Specifically, several of Future Motion's arguments in favor of personal
2  jurisdiction are dependent on JW's conduct expressly targeting *Future Motion* (*e.g.*, through the
3  stickers and through the chip named "FFM" which allegedly stands for F*ck Future Motion) –
4  with Future Motion suffering injury in California since it is located there. But the case law
5  (including Ninth Circuit case law) on which Future Motion relies to support its argument largely
6  predates *Walden v. Fiore*, 571 U.S. 277 (2014). The Ninth Circuit has expressly noted that,

> [i]n *Walden*, the Supreme Court rejected our conclusion that the defendants' "knowledge of [the plaintiffs'] 'strong forum connections,'" plus the "foreseeable harm" the plaintiffs suffered in the forum, comprised sufficient minimum contacts. The Court found that our approach "impermissibly allow[ed] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." The Court made clear that we must look to the *defendant's "own contacts"* with the forum, *not* to the defendant's knowledge of a *plaintiff's connections to a forum*.
>
> In light of the Court's instructions in *Walden*, mere satisfaction of the test outlined in *Washington Shoe* [*i.e.*, individualized targeting of the plaintiff by the defendant], without more, is insufficient to comply with due process. Following *Walden*, we now hold that while a theory of individualized targeting may remain relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction, absent compliance with what *Walden* requires.

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069-70 (9th Cir. 2017) (emphasis added).

Because much of Future Motion's supplemental brief is gutted by *Walden* and *Axiom Foods*, this leaves Future Motion with, in essence, two arguments: specifically, that there is personal jurisdiction over JW based on (1) its communications with California (*i.e.*, forum) residents and based on (2) its sales to California residents.

With respect to communications, as noted above, Future Motion has provided evidence demonstrating that JW has communicated with both prospective and existing customers located in California. But nothing in these communications suggests that *JW* is soliciting the customers; rather, the communications indicate that it is customers who are unilaterally reaching out to JW. Moreover, there is no evidence that JW's communications with customers targeted California in any way. The communications therefore provide little support to Future Motion.

With respect to sales, the Court first takes note of Future Motion's contention that the Court should consider not just the sales of the JWFFM Chips and the stickers but also the JW batteries. Future Motion acknowledges that its claims are technically based on the chips and stickers, not the batteries. However, it contends that the battery sales should still be counted because, as indicated above, the batteries and chips work hand in hand – *i.e.*, without the chips, the batteries cannot be used.

For purposes of the pending motion, the Court accepts Future Motion's contention that the sales of chips, stickers, *and* batteries should all count. But sweeping in batteries does not yield much, if any, real benefit to Future Motion. For example, as indicated above, based on jurisdictional discovery, it appears that, over a 16- to 17-month period, JW sold about 570 "relevant" products (both chips and batteries) to Californians. This translates to (1) about 36 sales per month to Californians and (2) about 17% of JW's total sales to Californians.

The percentage of sales is not particularly helpful. In *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020), the plaintiff was a Nevada company that produced and distributed adult entertainment over the Internet. The plaintiff discovered that there was an internationally available website, ePorner.com, that displayed the plaintiff's copyrighted works. ePorner.com was a Polish company owned in part by a Polish resident. *See AMA*, 970 F.3d at 1204-05. About 19% of the website's visitors were from the United States, "making the United States its largest market." *Id.* at 1205. But in spite of this percentage, the Ninth Circuit concluded that specific jurisdiction was lacking. The court noted that "we [have] held that a website's operators can be said to have 'expressly aimed' at a forum where a website 'with national viewership and scope *appeals to, and profits from*, an audience in a particular state.'" *Id.* at 1210 (emphasis added). But, essentially, there was nothing in the record to suggest that ePorner.com had appealed to a U.S. audience specifically. *See, e.g.*, *id.* at 1210 (stating that, even if "ePorner 'features a significant portion of U.S.-based content from producers like [plaintiff] and U.S.-based models,' this does not mean ePorner's subject matter is aimed at the U.S. market"; "ePorner's content is primarily uploaded by its users, and the popularity or volume of U.S.-generated adult content does not show that Wanat [the defendant] expressly aimed the site at the U.S. market"). This is the

same basic situation before the Court.  Although the percentage of sales to California is 17%, there is nothing to suggest JW has been appealing to a California audience specifically.[7]  Nothing shows that, relative to the consumer market for the products at issue, 17% is a substantially disproportionate share of the national market.

Future Motion suggests still that the regularity of sales should still be enough to support specific jurisdiction.  The Court does not dispute that, in some circumstances, regularity of sales can be significant.  Most notably, in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), the plaintiff was a New York resident who sued Hustler Magazine, a Ohio corporation, for allegedly libelous material published in the magazine.  She filed suit in New Hampshire in order to take advantage of the state's long statute of limitations.  Hustler had a circulation of about 10,000-15,000 copies per month in the state.  The Supreme Court held that Hustler's "regular circulation of magazines in the forum State is sufficient to support an exercise of jurisdiction in a libel action based on the contents of the magazine"; "[s]uch regular monthly sales of thousands of magazines [even though only 1% of total sales[8]] cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* at 773-74.  The court continued:

> Where, as in this case, respondent Hustler Magazine, Inc., has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine. . . . Respondent produces a national publication aimed at a national audience.  There is no unfairness in calling it to answer for the contents of that publication wherever a number of copies are regularly sold and distributed.

*Id.* at 781.

But the facts in *Keeton* are clearly different from those in the instant case.  In *Keeton*, the

---

[7] Admittedly, in *Ayla, Ltd. Liab. Co. v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021), the Ninth Circuit found that there was specific jurisdiction where the defendant's sales to the United States were only 10% of its total sales.  *See id.* at 981.  But notably, in *Ayla*, there were multiple advertisements by the defendant that specifically targeted Americans.  *See id.* at 980 (referring to advertising on Instagram with the words "ATTENTION USA BABES WE NOW ACCEPT after pay," advertising of Black Friday sales, and advertising on defendant's website that its products were featured in American magazines).

[8] *See Keeton v. Hustler Mag., Inc.*, 682 F.2d 33, 33 (1st Cir. 1982) ("[Defendants'] circulation in New Hampshire amounts to less than one percent of their total circulation in the United States.").

11

defendant regularly sold 10,000-15,000 copies of its magazine per month in New Hampshire. In contrast, here, JW averages sales of about 36 products per month to California. It appears that the substantial number of sales in *Keeton* allowed the Supreme Court to infer that the defendant was deliberately exploiting the New Hampshire market – and that the defendant could reasonably anticipate being haled into court in the state. That same reasoning does not have much traction in a case such as the instant suit where the number of sales is so significantly smaller.

Finally, the Court takes note of *Mavrix*, 647 F.3d at 1218, as there the Ninth Circuit addressed an issue similar to the one before this Court – specifically, "whether tortious conduct on a nationally accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed." *Id.* at 1229. In *Mavrix*, the plaintiff was a Florida company that licensed and sold candid photos of celebrities, *e.g.*, to magazines such as *People*. The defendant was a Ohio company that operated a website called celebrity-gossip.net. The plaintiff sued the defendant for copyright infringement in a California district court after the defendant posted the plaintiff's copyrighted photos on its website without permission. *See id.* at 1221-22.

The record did not reflect how many of the celebrity-gossip.net's visitors were from California. But notably, the record contained evidence that the website courted a California audience. *See id.* at 1222.

> As did Hustler in distributing its magazine in New Hampshire [in *Keeton*], Brand "continuously and deliberately exploited" the California market for its website. Brand makes money by selling advertising space on its website to third-party advertisers: the more visitors there are to the site, the more hits that are made on the advertisements; the more hits that are made on the advertisements, the more money that is paid by the advertisers to Brand. A substantial number of hits to Brand's website came from California residents. One of the ways we know this is that some of the third-party advertisers on Brand's website had advertisements directed to Californians. . . . *The fact that the advertisements targeted California residents indicates that Brand knows – either actually or constructively – about its California user base, and that it exploits that base for commercial gain by selling space on its website for advertisements.*

*Id.* at 1230 (emphasis added).

The Ninth Circuit also took into account that the defendant's website had

> a specific focus on the California-centered celebrity and

12

> entertainment industries. Based on the website's subject matter, as well as the size and commercial value of the California market, we conclude that Brand anticipated, desired, and achieved a substantial California viewer base. This audience is an integral component of Brand's business model and its profitability. As in *Keeton*, it does not violate due process to hold Brand answerable in a California court for the contents of a website whose economic value turns, in significant measure, on its appeal to Californians.

*Id.* at 1230; *see also id.* at 1231 (thus stating that, "where, as here, a website with national viewership and scope *appeals to, and profits from*, an audience in a particular state, the site's operators can be said to have 'expressly aimed' at that state") (emphasis added).

In contrast to *Mavrix*, there is nothing to suggest that the sales that JW made to California were tied in any way to some targeting of the forum state by JW or that JW otherwise appealed to a California audience even if that appeal did not produce actual sales. Indeed, based on the record submitted, the relatively small number sales in California could well have resulted without any effort on the part of JW to court a California audience at all.

While neither the Supreme Court nor the Ninth Circuit has articulated a concrete formula for determining personal jurisdiction under the express arising prong of the test where internet sales are involved, *cf. Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames, LLC*, No. 20-16123, 2021 U.S. App. LEXIS 36507, at *2 (9th Cir. Dec. 10, 2021) (not providing a specific test but indicating that, per *AMA*, *Mavrix*, and *Ayla*, the following information is relevant: revenue derived from the forum state, efforts to advertise in or market to or profit from the forum state, and distribution in the forum state), it is evident that, absent a large and regular volume of sales into the forum state, there must be some element of targeting the forum state that distinguishes the forum state from other states. Given the low volume of sales in the instant case and the lack of a clear disproportion of sales in California together with the lack of any evidence of specific targeting at California, there is no specific jurisdiction over JW.

///
///
///
///
///

13

### III. CONCLUSION

For the foregoing reasons, the Court grants JW's motion to dismiss for lack of personal jurisdiction. Because the Court dismisses for lack of personal jurisdiction, the Court need not address JW's additional contention that venue in this District was improper.

This order disposes of Docket No. 16.

The Clerk of the Court is ordered to enter a final judgment in accordance with this opinion and close the file in the case.

**IT IS SO ORDERED**.

Dated: May 2, 2022

_____
EDWARD M. CHEN
United States District Judge